**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**JIMMY SCOTT, JR.,**

**Plaintiff,**

**vs.**                                                                    **Case No. 4:14cv478-MW/CAS**

**SGT. G.H. CAMPBELL,
OFF. HOWELL,
and CAPT. MCCAMMAN,**

**Defendants.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, proceeding pro se, filed a motion for partial summary judgment pursuant to Rule 56, ECF No. 60, a memorandum of law, ECF No. 61, a statement of undisputed facts, ECF No. 62, and a declaration in support of his motion for partial summary judgment, ECF No. 64, with several exhibits.  ECF No. 64.  An Order was entered advising Plaintiff that his summary judgment motion was deficient and explaining the reason why.  ECF No. 68.  Pursuant to Rule 56(e), Plaintiff was provided an opportunity to file an amended summary judgment motion.  *Id.*

Thereafter, Plaintiff filed an amended motion for summary judgment, ECF No. 71.  Defendants filed a response in opposition to the amended summary judgment motion.  ECF No. 74.

Additionally, Defendants filed their own motion for summary judgment, ECF No. 63, which included a statement of material facts, incorporated memorandum of law, and numerous exhibits.  Plaintiff was advised of his obligation to respond, ECF No. 68, and he filed an amended response, ECF No. 72, on April 11, 2016.  Thereafter, Defendants filed a reply,[1] ECF No. 75, to Plaintiff's response on April 29, 2016.

Accordingly, Plaintiff's initial motion for partial summary judgment, ECF No. 60, should be denied as moot in light of the filing of the amended motion, ECF No. 71.

---

[1] Pursuant to Local Rule 56.1(D), a party may file a reply memorandum of up to 3,200 words "only if the opposing memorandum raised new matters not addressed in the original supporting memorandum."  N.D. Fla. Loc. R. 56.1(D).  "The deadline for a reply memorandum is 7 days after the opposing memorandum is filed—without a 3-day extension based on electronic service of the opposing memorandum."  *Id.*  Defendants' reply, ECF No. 75, was filed on April 29, 2016, which is more than 7 days as stated in Rule 56.1.  However, the March 1, 2016, Court Order provided that deadline and, thus, the reply was timely filed and appropriately may be considered.  Additionally, Plaintiff was also permitted to file a reply to Defendants' response to his amended summary judgment motion, *see* ECF No. 68, but he did not do so.

## Allegations of the Amended Complaint, ECF No. 12

The events at issue in this case occurred at Taylor Correctional Institution in January 2014.  ECF No. 12 at 3.  Plaintiff Jimmy Scott, Jr., alleged that he was housed in segregation with inmate Steven DeWitt[2] who began making sexual advances towards him.  Mr. Scott alleged that he told Sergeant Campbell that Mr. DeWitt's "sexual advances" made "him very uncomfortable being in the cell with" Mr. DeWitt.  ECF No. 12 at 11.  He alleged telling Sergeant Campbell about several instances in which Mr. DeWitt made sexual comments to him, that Mr. DeWitt was "fondling himself," and wanting Mr. Scott to display himself for Mr. DeWitt to masturbate.  *Id.*  Mr. Scott requested that he be separated from Mr. Dewitt, expressing fear for his safety.  *Id.*  Sergeant Campbell initially agreed and directed Mr. DeWitt to pack up his belongings and "be ready to move" when Sergeant Campbell returned.  *Id.* at 4.

Mr. Scott alleges that when Sergeant Campbell returned with Officer Howell, Mr. DeWitt refused to move.  *Id.*  Sergeant Campbell said he did

---

[2] Mr. Scott has spelled this surname as Dewitt, but Defendants' evidence indicates the name is spelled DeWitt.  ECF No. 63.  The correct spelling of the name has been used.  Additionally, in reviewing the summary judgment materials, it appears that Defendant McCamman's name is spelled differently than used by Mr. Scott.  That name has also been corrected throughout this Report and Recommendation.

not have time for games and told Messrs. Scott and Dewitt to "fight it out."
*Id.* Mr. Scott alleges that Mr. DeWitt was "raging" and called him a "snitch"
for reporting his behavior to prison officials. *Id.*

Some time later, Officer Howell was performing a "routine check" and
Mr. Scott stopped him, requesting to be moved since Mr. DeWitt refused to
move and advising of DeWitt's behavior. *Id.* at 4. Officer Howell said he
could not do as requested, but would let Sergeant Campbell know. After
Officer Howell left to continue his routine check, Mr. DeWitt allegedly
attacked Mr. Scott from behind. Mr. Scott said he was able to fend off
Mr. DeWitt, but not without injury. *Id.* at 5. Mr. Scott kicked on the cell
door for assistance, and Sergeant Campbell responded, finding Mr. DeWitt
unconscious on the floor. *Id.* Mr. Scott was removed from the cell and
questioned by Lieutenant Moss. *Id.* During that questioning, both
Sergeant Campbell and Officer Howell were present and admitted that they
did not separate Messrs. Scott and DeWitt. *Id.*

Mr. Scott also alleges that when he complained about his injuries and
requested medical treatment, Captain McCamman told him to "shut up"
and informed him that he would not be receiving any treatment. *Id.* at 6.
Captain McCamman threatened Mr. Scott with retaliation if he ran his

mouth and caused trouble.  *Id.*  Mr. Scott alleges that he did not receive

any medical attention during Captain McCamman's shift, but he eventually

declared a medical emergency and was examined by a nurse.  *Id.*

Mr. Scott was afraid of retaliation, so he claimed he was okay and only

needed pain medication.  *Id.*  Mr. Scott said he suffered for approximately a

month and a half with untreated injuries until he was transferred and felt

safe enough to report the matter and seek treatment.  *Id.*  Mr. Scott

asserted Eighth Amendment claims against Defendants Campbell and

Howell for failure to protect him, an Eighth Amendment claim against

Defendant Campbell concerning the racially charged statement, and Eighth

and First Amendment claims against Defendant McCamman for preventing

him from receiving medical treatment and threatening him to not report his

injuries or seek relief.  ECF No. 12.

**Legal standards governing a motion for summary judgment**

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fᴇᴅ. R. Cɪᴠ. P. 56(a).  Thus,

summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[3] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of

evidence" is not enough to refer the matter to a jury).  The Court must

decide "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L.

Ed. 2d 202 (1986).  All "justifiable inferences" must be resolved in the light

most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct.

at 2578 (noting the distinction "between evidence of disputed facts and

disputed matters of professional judgment."),[4] but "only if there is a

'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557

U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where

the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec.

Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

**The relevant Rule 56(e) evidence**

---

[4] Noting that deference must be given "to the professional judgment of prison administrators," the Court stated that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." Beard, 548 U.S. at 530, 126 S. Ct. at 2578 (citing Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003)).

## A. Defendants' evidence

On January 7, 2014, Mr. Scott was housed in a confinement cell at Taylor Correctional Institution with inmate Steven DeWitt. ECF No. 63, Ex. B at 1 (Incident Report, ECF No. 63-2). Sergeant Campbell was the G-Dormitory sergeant on duty on January 7, 2014. ECF No. 63, Ex. C at 1 (ECF No. 63-3, Campbell Declaration). Sometime after lunch had been served, Sergeant Campbell was stopped by Mr. Scott who said something similar to "me and my cellmate ain't vibin." ECF No. 63, Ex. C at ¶ 2. Sergeant Campbell was unable to address the issue at that time as he was moving inmates for disciplinary hearings. *Id.*

Sergeant Campbell returned to Mr. Scott's cell at 3:18 p.m. with Officer Howell to separate Mr. Scott and Mr. DeWitt. ECF No. 63, Ex. D at ¶ 2 (ECF No. 63-4, Howell Declaration). Sergeant Campbell wanted to separate Mr. Scott and Mr. DeWitt as a "proactive measure to prevent any problems" even though Mr. Scott's statement that he and his cellmate "were not 'vibin' did not did not require that the inmates be separated." ECF No. 63, Ex. C at ¶ 2.

Sergeant Campbell ordered both Mr. Scott and Mr. DeWitt "to submit to hand restraints so that they could be moved." *Id.; see also* ECF No. 63,

Ex. D at ¶ 2.  "However, both inmates at [that] time said that everything was alright and that they didn't need to be separated."  *Id.*  Based on their statements, Sergeant Campbell "no longer felt that separating them was necessary" so he returned to his duties, ECF No. 63, Ex. C at ¶ 2, and Officer Howell returned to his duties.  ECF No. 63, Ex. C at ¶ 2.

At 3:41 p.m., Officer Howell was stopped by Mr. Scott who said, "Tell Sarge I'll pack up and move this just ain't gonna work."  ECF No. 63, Ex. D at ¶ 3; see also Ex. C at ¶ 3.  Officer Howell relayed the message to Sergeant Campbell a few minutes later.  *Id.*  Sergeant Campbell "began looking for a suitable cell for both inmates" when he observed Mr. Scott "kicking on his cell door and waving a white rag."  ECF No. 63, Ex. C at ¶ 3. Sergeant Campbell approached the cell door and saw Mr. Scott standing at the door and Mr. DeWitt "lying on the cell floor with his hands and feet tied up with what appeared to be a sheet."  *Id.*  Sergeant Campbell saw that Mr. DeWitt was "bleeding profusely from his head area" and was dazed.  *Id.* Sergeant Campbell ordered Mr. Scott to submit to hand restraints and he complied.  *Id.*  Sergeant Campbell also activated his personal body alarm to request assistance.  *Id.*

Captain McCamman was called to G-dormitory by Sergeant Campbell.  ECF No. 63, Ex. E at ¶2.  When he arrived, Mr. DeWitt "was lying on the floor of the cell bleeding from his head with his hands and feet bound behind his back."  *Id.*  Mr. DeWitt was "escorted to the medical department for further evaluation and was eventually referred to an outside hospital for treatment."  *Id.*

Mr. Scott "freely admitted" to Captain McCamman that he had knocked out Mr. DeWitt and tied him up, but claimed that Mr. DeWitt "had punched him in the back of the head."  ECF No. 63, Ex. E at ¶2; ECF No. 63, Ex. E at ¶ 2.  Captain McCamman accompanied Mr. DeWitt to the medical department and stayed with him until the ambulance arrived to take him to an outside hospital for treatment.  ECF No. 63, Ex. E at ¶ 2. When Captain McCamman's shift ended that day, he left Taylor C.I. and began to drive home.  *Id.*  On the way home, Captain McCamman realized that in the rush to get medical treatment for Mr. DeWitt, Mr. Scott had not been seen by medical personnel.  *Id.*  Captain McCamman called back to the institution and spoke with Captain Fronek, the Captain who took over after Captain McCamman's shift ended, and informed him that Mr. Scott needed to be evaluated by medical.  *Id.*

Mr. Scott was seen by Nurse Dennis at approximately 9:15 p.m. that evening.  ECF No. 63, Ex. B at 3.  No injuries were noted.  *Id.*

Captain McCamman completed the "Shift Supervisor" comment section of the Incident Report concerning this incident and, to be thorough, reviewed the confinement video footage from 2:00 p.m. to 3:51 p.m., the time when inmates Scott and DeWitt were removed from their cells.[5]  ECF No. 63, Ex. E at ¶ 3; Ex. B at 2.  Captain McCamman's video review "showed that numerous correctional officials conducted wing checks during this time period."   ECF No. 63, Ex. E at ¶ 3.  Captain McCamman "conducted a wing check at 2:32 p.m."  *Id.*  The video also showed that Warden McCallum, Assistant Warden Drake, and Mr. Mills conducted a wing check at 2:45 p.m.  *Id.*  Captain McCamman said that either Mr. Scott or Mr. DeWitt could have stopped the Warden or Assistant Warden to express any problems they were having, or to report misconduct or officer threats.  *Id.* at ¶ 6.  "The purpose of the Warden and Assistant Warden conducting wing checks in confinement is so that they can maintain a presence and so that inmates can report problems to them."  *Id.*  Captain

---

[5] Captain McCamman noted in the incident report that the fight between Mr. Scott and Mr. DeWitt occurred at approximately 3:45 p.m., and Mr. Scott was not evaluated by medical personnel until 9:15 p.m.  *See* ECF No. 63, Ex. B at 2-3.

McCamman's review of the footage showed that neither Mr. Scott nor

Mr. DeWitt ever attempted to stop the Warden or Assistant Warden to

report a problem or discuss any issues with them.  *Id.*  Furthermore,

Captain McCamman advised that neither inmate informed him that they

were having problems or were in fear and needed to be moved.  *Id.* at ¶ 5.

Sergeant Campbell also recalled that "the Warden, Assistant

Warden, and Classification Supervisor were in the dormitory that day

conducting their weekly rounds."  ECF No. 63, Ex. C at ¶ 4.  "As part of

these rounds, the Warden, Assistant Warden, and Classification Supervisor

walk past every cell."  *Id.*

Sergeant Campbell denies that Mr. Scott told him "that his cellmate

was making sexual advances."  ECF No. 63, Ex. C at ¶ 5.  Sergeant

Campbell denies suggesting that Mr. Scott and Mr. DeWitt fight or that

Mr. Scott "was 'big and black enough' to handle himself."  *Id.*  Sergeant

Campbell said that if Mr. Scott had informed him "that he was being

sexually harassed, [he] would have taken immediate action."  *Id.*

Officer Howell has responded to Mr. Scott's assertion that he found it

funny that Mr. Scott said he had been sexually harassed by stating the

"conversation never happened."  ECF No. 63, Ex. D at ¶ 4.  Officer Howell

also states that he "never heard Sergeant Campbell suggest that" the inmates should fight "or that inmate Scott was 'big and black enough' to handle himself."  *Id.*

   In Captain McCamman's Declaration, he flatly denied that he ever threatened Mr. Scott or denied him medical treatment.  ECF No. 63, Ex. E at ¶4.  He declares that he "did not threaten inmate Scott or deny him medical treatment."  *Id.*  "In fact, upon realizing that [Mr.] Scott did not receive a medical examination after this incident, [he] immediately called on-duty Captain Fronek and told him that [Mr.] Scott needed to be evaluated by medical."  *Id.*

   The Office of the Inspector General investigated the incident and recommended that the case be closed because "there were no independent witnesses identified nor [was] there any additional reliable evidence supporting a criminal offense of sexual battery."  ECF No. 63, Ex. G.  The Inspector General's office also found that Mr. Scott was evaluated on January 7, 2014, with no injuries noted, nor any complaints of injuries.  *Id.*  It was noted, however, that Mr. Scott received a medical review on February 28, 2014, when the allegations of sexual abuse were filed.  *Id.*  The "evaluation showed swelling of one of [Mr.] Scott's testicles and

swelling to his right ring finger." *Id.* The Inspector General's report stated that it was "unknown whether the injuries" to Mr. Scott were sustained on January 7, 2014, seven weeks earlier, or more recently. *Id.*

Mr. DeWitt suffered "severe injuries" as a result of the physical altercation with Mr. Scott. *Id.* The "incident was not pursued by the Office of Inspector General due to the lack of willingness of [Mr. DeWitt] to participate in a criminal investigation." *Id.*

Mr. Scott testified during his deposition that he told the Captain on the next shift (Captain Fronek) that he had not seen medical and that Captain McCamman threatened him. ECF No. 63-6 at 5 (ECF No. 63, Ex. F at 21). Mr. Scott said that although he was "fearful," he "needed to get some medication so [he] had to tell somebody." *Id.* at 6 (Ex. F at 22). As Mr. Scott was being examined by medical (Nurse Dennis), he saw that a camera had been brought in and became fearful of retaliation. *Id.* at 7 (Ex. F at 23). Mr. Scott testified that he "refused everything" and just requested "some ibuprofen." *Id.* at 7 (Ex. F at 23). Mr. Scott also testified that Sergeant Campbell intentionally refused to separate him from Mr. DeWitt, although he believed that Sergeant Campbell "came back" to his cell "with good intentions." ECF No. 63-6 at 9 (Ex. F at 52). Mr. Scott conceded that

Sergeant Campbell attempted to separate himself and Mr. DeWitt, but

Mr. DeWitt refused.  *Id.*

## B.    Plaintiff's evidence

Mr. Scott provided his own declaration stating that at approximately

11:30 a.m., during lunchtime tray pickup on January 7, 2014, he told

Sergeant Campbell that his cellmate was "making sexual advances toward"

him and he requested that Sergeant Campbell separate them.  ECF No.

71, Ex. A at 1;[6] ECF No. 66 at 12.  Mr. Scott states that Sergeant Campbell

agreed to do so, but explained that they needed to wait until he was

finished moving inmates to and from disciplinary hearings.  ECF No. 71,

Ex. A at 1.  He ordered Mr. DeWitt "to pack all property and be ready for

cell change upon his return."  *Id.*

A few hours later, at 3:18 p.m., Sergeant Campbell came to

Mr. Scott's cell door and Mr. Scott could hear Sergeant Campbell relaying

that Mr. Scott was in fear of his safety from his cellmate making sexual

advances.  *Id.*  Sergeant Campbell then said, "let's go ahead and separate

them by moving his cellmate," Mr. DeWitt.  *Id.* at 1-2.  Mr. Scott said that

---

[6] Mr. Scott's declaration, filed as Exhibit A on the electronic docket, was inadvertently separated.  Pages one and two were filed together at pages 21-22, but the third page of the declaration was filed at page 19.  ECF No. 71.

Officer Howell, who was with Sergeant Campbell "found the situation . . . funny." *Id.* at 2.  Sergeant Campbell opened the cell door and ordered Mr. DeWitt to submit to hand restraints to be moved.  *Id.*  Mr. DeWitt refused to comply and replied, "I ain't moving no where!"  *Id.*  Sergeant Campbell said that he didn't have time to play games and closed the cell door.  *Id.*  He then looked at Mr. Scott and said, "you are big and black enough, y'all fight it out."  *Id.*  Sergeant Campbell then walked off with Officer Howell, leaving Mr. DeWitt in the cell with Mr. Scott.  *Id.*

At 3:41 p.m., Officer Howell entered the wing to conduct a routine security check.  ECF No. 71, Ex. A at 2.  Mr. Scott stopped him and complained that Mr. DeWitt "was raging" and called him a "snitch" for requesting help.  *Id.*  Mr. Scott said that since Mr. DeWitt had refused to move to another cell, he would move and asked Officer Howell to tell Sergeant Campbell know he was packed and could be moved.  *Id.* Mr. Scott then questioned whether Officer Howell could move him.  Officer Howell said he could not do so, but would let Sergeant Campbell know.  *Id.*

A short time later, Mr. Scott said that Mr. DeWitt hit him in the back of his head and put him in a choke hold.  ECF No. 71, Ex. A at 2.  Mr. DeWitt then tried to touch Mr. Scott in a "sexual manner" at which point Mr. Scott

began to struggle with him "in self defense."  *Id.*  Mr. DeWitt yanked

violently on Mr. Scott's testicles which prompted a "fist fight" between

Mr. Scott and Mr. DeWitt.  *Id.*  Mr. Scott said after he stopped Mr. DeWitt's

sexual assault, he "started kicking on the celldoor for help."  *Id.*

 Sergeant Campbell responded and found Mr. DeWitt "hog tied on the

cell floor."  ECF No. 71, Ex. A at 3.  Sergeant Campbell, along with other

officers, removed Mr. Scott and Mr. DeWitt from the cell to await medical

treatment.  *Id.*  Mr. Scott said that when medical staff entered the wing, he

began calling to them "seeking treatment for the injuries [he] received but

was interrupted by" Captain McCamman who approached Mr. Scott's cell.

*Id.*  Captain McCamman told him that he would not be receiving treatment

and threatened him saying, "If you keep running your mouth and get my

officers in trouble you'll learn the ward way" that "inmates at Taylor C.I.

accendently [sic] slip and fall down the stairs and get all their gold teeth

knocked out."  *Id.*

 Mr. Scott said he was not evaluated by medical staff until the next

shift when he declared a medical emergency to Captain Fronek.  *Id.*  At

approximately 9:15 p.m., Mr. Scott was seen by Nurse Dennis, but he said

that he was afraid of retaliation after Captain McCamman's threat and did

not report his injuries. *Id.* Mr. Scott said that he was given pain medication

and then waited until he was transferred to the Annex where he was safe

before reporting the matter and getting treatment. *Id.* Mr. Scott reports

suffering a concussion, a broken finger, and an infection in his testicles

from "delayed medical treatment which cause[d] a lot of pain and suffering."

ECF No. 71, Ex. A at 3; *see also* ECF No. 66 at 145.

Mr. Scott had an interview with Mr. Potter from the Inspector

General's Office. ECF No. 71, Ex. A at 3. Mr. Scott requested the video

footage of G-Wing for the time of the events in question to show Captain

McCamman was not with Mr. DeWitt, but in the Sergeant's Office. *Id.*

Additionally, Mr. Scott said that the warden and other officials did not walk

through the wing on January 7, 2014, the date of the incident. *Id.* He also

denied that he merely told officials that he and his cellmate weren't "vibing"

and denied that he said "everything is alright" and they did not need to be

separated. ECF No. 66 at 13.

As additional evidence, Mr. Scott submitted the witness statement of

inmate Bradley Cox. ECF No. 66 at 16. Inmate Cox stated that he heard

the inmates ask Sergeant Campbell to move one of them out of the cell

"before they got into an altercation." *Id.* Sergeant Campbell told one of

inmates to pack his belongings, but when he returned after lunch to move him, the inmate "refused to cuff up."  *Id.*  Inmate Cox stated that Sergeant Campbell then said, "Well I guess y'all will just have to fight" and he left.  *Id.*  Inmate Cox said that about five minutes later, he heard "a commotion" and Sergeant Campbell came and took one of the inmates out of the room and called for medical.  *Id.*

Mr. Scott also submitted an affidavit from inmate Jeffrey Brown.  ECF No. 66 at 31.  Mr. Brown states that he overheard the comments from Sergeant Campbell and saw him leave the area with Officer Howell.  *Id.*  About 30 minutes later he heard a commotion upstairs and then kicking on a cell door upstairs.  *Id.*  Mr. Brown saw the Captain and other officers rush upstairs and then bring Mr. Scott downstairs to the shower cell, which was next to Mr. Brown's cell.  *Id.*  Mr. Brown heard Mr. Scott tell Lieutenant Moss that he had tried to get help from Sergeant Campbell and Officer Howell.  *Id.*  Lieutenant Moss asked Campbell and Howell whether that was true "and they agreed."  *Id.*  Sergeant Campbell explained that Mr. Scott's cell mate "refused to cuff up."  *Id.*  Mr. Brown said he heard Mr. Scott "complaining about his injuries, but" he was "cut off" by Captain McCamman.

## Analysis

The Eighth Amendment[7] governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  Although the Amendment does not require comfortable prisons, it prohibits inhumane ones.  *Id.*  The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)).  "[B]asic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety."  Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr.l Inst., 452 F.App'x 848, 850-851 (11th Cir. 2011)).

## A.    Failure to Protect

---

[7]  "In the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation."  Thomas v. Bryant, 614 F.3d 1288, 1303-04 (11th Cir. 2010).  This case raises both a claim to the conditions of confinement and a deliberate indifference to medical needs claim, but not  an excessive force claim.

Pursuant to the Eighth Amendment, prison officials have "the duty to 'provide humane conditions of confinement.'"  Farmer, 511 U.S. at 832, 114 S. Ct. at 1976.  The Eighth Amendment requires officials "take reasonable measures to guarantee the safety of the inmates."  511 U.S. at 832, 114 S. Ct. at 1976 (quoting Hudson v. Palmer, 468 U.S. 517, 526- 527, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984)).  In guaranteeing their safety, officials must "protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833, 114 S. Ct. at 1976-1977.  However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834, 114 S. Ct. at 1977.

To prevail on an Eighth Amendment failure-to-protect claim, a prisoner must make two showings.  First, he must demonstrate that he is "incarcerated under conditions posing a substantial risk[8] of serious harm." Farmer, 511 U.S. at 834, 114 S. Ct. at 1977 (citing Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481, 125 L. Ed. 2d 22 (1993)). Second, he must show that the defendant prison official had a "culpable

---

[8] The Court did not address the question of "[a]t what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes."  511 U.S. at 834, n.3, 114 S. Ct. at 1977, n.3.

state of mind" (be deliberately indifferent) in that he knew of and disregarded "an excessive risk to inmate health or safety."  511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979.  In other words, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837, 114 S. Ct. at 1979.  The "deliberate indifference" standard "entails something more than mere negligence," but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Id.* at 835, 114 S. Ct. at 1978.

Because the Court explicitly rejected the invitation to utilize a completely objective test, analysis of these issues requires an "inquiry into a prison official's state of mind."  *Id.* at 837-38, 114 S. Ct. at 1979.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Id.*  It is important to keep in mind that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'"  *Id.* at 837, 114 S. Ct. at 1979.

Also guiding review of this claim are decisions from the Eleventh
Circuit Court of Appeals.  In McBride v. Rivers, 170 F. App'x 648, 649-50
(11th Cir. 2006), a prisoner brought a complaint under § 1983 asserting
that prison officials  violated his Eighth Amendment rights by "not taking
reasonable measures to protect him from another inmate."  McBride asked
the defendants to "not place him in a cell with anybody with whom he had
problems."  Id. at 650. When McBride saw that he was going to be housed
with inmate Holmes, McBride said, "me and that dude had problems. I'm in
fear for my life. Don't put me in the cell with him." 170 F. App'x at 652.
McBride was "forcibly placed" in the cell anyway and the two inmates got
into a fight rather quickly, albeit because McBride pushed inmate Holmes
and started the altercation.  Id. at 652, 655.  The Eleventh Circuit affirmed
the district court's granting of summary judgment in favor of defendants on
the basis that McBride's statement to defendants "failed to show that the
defendants had subjective knowledge of a risk of serious harm."  170 F.
App'x at 655.  The Court held that McBride's statement to defendants was
only a "general request" and lacked specifics (such as a prior incident) from
which defendants could infer a substantial risk existed.  Id.

Similarly, in Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003),

defendants had "specific notice" from the plaintiff that another inmate was

acting "crazy, roaming his cell like a 'caged animal.'"   Carter, 352 F.3d at

1349.  However, the Court held that before a defendant's "awareness

arises to a sufficient level of culpability, there must be much more than

mere awareness of [an inmate's] generally problematic nature."  *Id.*

Relying on Farmer, the Eleventh Circuit concluded that even "assuming the

existence of a serious risk of harm and legal causation, the prison official

must be aware of specific facts from which an inference could be drawn

that a substantial risk of serious harm exists—and the prison official must

also 'draw that inference.'"  352 F.3d at 1349 (citing Farmer, 511 U.S. at

837, 114 S.Ct. at 1979).  Summary judgment was deemed appropriate in

Carter because although the defendant "heard many complaints from

[p]laintiff," the plaintiff never told the defendant that he "feared" the inmate

or had been "clearly threatened."  *Id.*  The court held that "[d]efendants

arguably should have placed [p]laintiff elsewhere but 'merely negligent

failure to protect an inmate from attack does not justify liability under

section 1983 . . . .'"  Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir.

1990) (quoted in Carter, 352 F.3d at 1350); *see also* Chatham v. Adcock,

334 F. App'x 281, 294 (11th Cir. 2009) (finding that identification of a "problem inmate" with "violent tendencies" simply "does not satisfy the subjective awareness requirement" under the Eighth Amendment).  Prison officials are not required "to read imaginatively all derogatory and argumentative statements made between prisoners to determine whether substantial risks of serious harm exist."  352 F.3d at 1350.

In Bettencourt v. Owens, 542 F. App'x 730, 732 (11th Cir. 2013), a prisoner filed a § 1983 claim asserting that defendants failed to protect him from a violent rape by another prisoner.  The plaintiff had sent several notes explaining that he was being "sexually harassed" and requested that he be placed in either protective custody or housed in a different building prior to the assault.  Bettencourt, 542 F. App'x at 732.  Nonetheless, the Eleventh Circuit affirmed dismissal of the complaint on the basis that his complaints of "sexual harassment," without more specific facts, "could have merely been about 'obscene remarks' or 'uninvited and unwelcome verbal . . . behavior of a sexual nature,' neither of which indicate that [the plaintiff] faced a substantial risk of serious harm."  542 F. App'x at 735.

Here, there is a dispute of fact between the parties.  Viewing the evidence in the light most favorable to Mr. Scott and resolving all "justifiable

inferences" in his favor as the "nonmoving party" in responding to

Defendants' summary judgment motion reveals Mr. Scott told Sergeant

Campbell that his cellmate was "making sexual advances toward" him and

he requested that Sergeant Campbell separate them.  Mr. Scott did not

provide any specific facts to Sergeant Campbell showing that he faced "a

substantial risk of serious harm."  He described "sexual advances," but did

not assert a specific concern for his physical safety.  Mr. Scott did not

request protective custody.  He did describe a physical threat.  He did not

suggest that it was an emergency situation.[9]  Mr. Scott merely requested

that he and Mr. DeWitt be separated.  Under the Eleventh Circuit case law

cited above, a prisoner's assertion to a prison official that another inmate's

"advances" made him "very uncomfortable"[10] is insufficient to demonstrate

---

[9] Furthermore, the request to be separated was made on the same day as the physical altercation, only a few hours before.  Without some showing of an emergent situation, Mr. Scott's complaint to Sergeant Campbell was not sufficient to demonstrate a "substantial risk" of harm such that Sergeant Campbell had a sufficient level of culpability.

[10] Mr. Scott alleged in the complaint, under penalty of perjury, that he told Sergeant Campbell that Mr. DeWitt was "making sexual advances" which made "him very uncomfortable being in the cell with" Mr. DeWitt.  ECF No. 12 at 11.  The complaint alleged several specific instances of sexual comments and Mr. DeWitt "fondling himself" and wanting Mr. Scott to display himself for Mr. DeWitt to masturbate.  *Id.*  However, there were no allegations of physical harm to Mr. Scott.

a "substantial risk of serious harm."  Summary judgment should be granted in favor of Sergeant Campbell.

As for the claim against Officer Howell, viewing the evidence in the light most favorable to Mr. Scott, it is accepted that at 3:41 p.m., he complained to Officer Howell that Mr. DeWitt "was raging" and had called him a "snitch."  Mr. Scott asked Officer Howell to tell Sergeant Campbell that he would move to another cell, if Officer Howell could not move him. Officer Howell advised Mr. Scott that he could not move him, but would let Sergeant Campbell know.

The undisputed evidence is that the physical altercation between Mr. Scott and Mr. DeWitt occurred at 3:45 p.m.  Even assuming that Mr. Scott provided sufficient specific facts to Officer Howell which would demonstrate that Mr. Scott faced "a substantial risk of serious harm," the evidence does not reveal Officer Howell was deliberately indifferent to that risk.  First, Officer Howell did as asked and relayed Mr. Scott's message to Sergeant Campbell who "began looking for a suitable cell for both inmates." Officer Howell took action to assist Mr. Scott and did not have a "culpable state of mind."

Second, the timing of Mr. Scott's request to Officer Howell did not provide sufficient opportunity for Officer Howell, or Sergeant Campbell for that matter, to provide assistance.  The altercation occurred within four minutes of Mr. Scott's request to Officer Howell to be moved.  Mr. Scott did not advise Officer Howell that it was an emergency; he merely indicated his willingness to be moved.  Summary judgment should be granted in favor of Officer Howell as well.

## B.   Racial Comments

Mr. Scott also asserted an Eighth Amendment claim for the alleged comment made by Sergeant Campbell: "you are big and black enough, y'all fight it out."  ECF No. 12 at 8.  Sergeant Campbell denies making the comments as alleged.  Notwithstanding this dispute between the parties, the Eighth Amendment prohibits "cruel and unusual punishments" and abuse from prison officials.  However, verbal abuse, without more, is insufficient to state a constitutional claim under the Eighth Amendment. Edwards v. Gilbert, 867 F.2d 1271, 1274 n.1 (11th Cir.1989) (cited in Hernandez v. Florida Dep't of Corr., 281 F. App'x 862, 866 (11th Cir. 2008)); *see also* Sims v. Hickok, 185 F.3d 875 (10th Cir. 1999) (finding complaint failed to state a claim because officer's "racial and sexual slurs"

were "insufficient to amount to an Eighth Amendment violation"); Siglar v.

Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (finding it "clear that verbal

abuse by a prison guard does not give rise to a cause of action under §

1983"); Magwood v. Beem, No. 4:14cv314–MW/CAS, 2015 WL 796242,

*13 (N.D. Fla. Feb. 25, 2015) (stating that "courts have held that verbal

harassment, abuse, or taunting is not sufficient to state a constitutional

deprivation under 42 U.S.C. § 1983") (cited in Dunn v. Crews, No.

3:14CV594/MCR/CJK, 2015 WL 4078190, at *4 (N.D. Fla. July 2, 2015)).

Even accepting Mr. Scott's evidence as true, he has not demonstrated an

actionable Eighth Amendment claim concerning the use of racially charged

language.  Summary judgment should be granted in favor of Sergeant

Campbell.

## C.   Denial of Medical Care

Deliberate indifference to the serious medical needs of sentenced

prisoners violates the Eighth Amendment's prohibition of cruel and unusual

punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d

251 (1976).  A "'serious' medical need is one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention."  Hill v.

Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994),

abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct.

2508, 153 L.Ed.2d 666 (2002) (quoting Laaman v. Helgemoe, 437 F. Supp.

269, 311 (D. N.H. 1977)).  Alternatively, "a serious medical need is

determined by whether a delay in treating the need worsens the condition"

or "if left unattended, poses a substantial risk of serious harm."  Mann v.

Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citing Hill, 40

F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir.

2003)).

The concept of deliberate indifference entails something more than

negligence, but is satisfied by something less than actions undertaken with

an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).

Subjective recklessness, as defined in criminal law, is the standard which

must be shown for an official's actions to rise to the level of deliberate

indifference.  Id.  Deliberate indifference has been described as a culpable

state of mind of the defendant to unnecessarily and wantonly inflict pain or

harm to a prisoner by depriving him of a basic human need.  Wilson v.

Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Ultimately, there are four requirements to present an Eighth Amendment claim for the denial of medical care: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001); Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). Put another way, once a prisoner shows that he has a serious medical need, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill, 40 F.3d at 1187. An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255 (citing Lancaster v. Monroe

Cnty., Ala., 116 F.3d 1419, 1425 (11th Cir. 1997)); Mandel v. Doe, 888

F.2d 783, 788 (11th Cir. 1989).

Mr. Scott alleged that Captain McCamman threatened him and

prevented him from receiving medical care.  Mr. Scott presented evidence

showing that after the fight, medical staff entered the wing and he began

calling out to them "seeking treatment for the injuries [he] received but was

interrupted by" Captain McCamman.  Mr. Scott stated in his Declaration

that Captain McCamman told him that he would not be receiving treatment

and threatened him.

Mr. Scott said he was not evaluated by medical staff until the next

shift when he declared a medical emergency to Captain Fronek.  *Id.*

Mr. Scott was then seen by Nurse Dennis, but he said that he was afraid of

retaliation after Captain McCamman's threat and did not report his injuries.

Captain McCamman denies that he threatened Mr. Scott or denied him

medical care.  He admits to inadvertently delaying medical treatment for

Mr. Scott because of the severity of Mr. DeWitt's injuries, but declared that

when he remembered, he telephoned back to the institution to have

Mr. Scott evaluated by medical personnel.[11]

There is a dispute between the parties concerning this claim.

Captain McCamman argues that Mr. Scott's version of events is

implausible and Captain McCamman simply forgot to provide medical care

to Mr. Scott due to the more critical needs of Mr. DeWitt.  It was also

suggested that the lack of an incident report from Captain Fronek

demonstrates that Mr. Scott did not declare a medical emergency but,

instead, McCamman remembered that Mr. Scott should have been

assessed and called Captain Fronek who arranged for medical personnel

to see Mr. Scott.  ECF No. 63 at 21.  If Captain McCamman's version of the

events were believed, summary judgment would be appropriate because

"[t]he inadvertent or negligent failure to provide adequate medical care

'cannot be said to constitute 'an unnecessary and wanton infliction of

pain.'"  Estelle, 429 U.S. at 105–06, 97 S.Ct. 285 (quoted in Farrow, 320

F.3d at 1243).

---

[11] As pointed out by Mr. Scott, Florida Department of Corrections rules require that "all inmates involved in a physical altercation be immediately evaluated [and] treated by medical."  ECF No. 71 at 14.

Mr. Scott's version of events are unlikely, and it would be suspect to tell a prison official that another official threatened him yet then refuse to provide information to the nurse who is summoned to examine Mr. Scott. While unlikely, that is Mr. Scott's testimony.  It is not appropriate to make credibility determinations at the summary judgment stage of litigation based on affidavits and declarations.  Captain McCamman's version of events cannot be accepted as true simply because Mr. Scott's version is unlikely.

However, Mr. Scott has not demonstrated a sufficient Eighth Amendment claim against Captain McCamman because he has not shown all four factors: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Taylor, 221 F.3d at 1258.  Mr. Scott has shown that he requested medical care, but he made only vague and general assertions that he was injured.  Mr. Scott has not presented any evidence to show that any named Defendant had a "subjective awareness" that he had a *serious* medical need.  Mr. Scott has not demonstrated that he told Captain McCamman that he was in great pain or suspected that his finger was broken.  To be liable under § 1983, a prison "official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference." McElligott, 182 F.3d at 1255 (citing Farmer, 511 U.S. at 837, 114 S.Ct. 1970).  Accordingly, Mr. Scott has not shown that Captain McCamman "acted with an attitude of 'deliberate indifference'" because he was aware that Mr. Scott had a serious medical need and refused to provide treatment.  Accordingly, summary judgment should be granted in favor of Captain McCamman on the Eighth Amendment claim.

**D.    Retaliation**

Prisoners retain those First Amendment rights that are not inconsistent with their status as prisoners" or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974); Al–Amin v. Smith, 511 F.3d at 1317, 1333 (11th Cir. 2008).  Prison officials may not infringe on an inmate's First Amendment right to petition the government for a redress of his grievances with a practice that is "not reasonably related to legitimate penological objectives" or take certain actions "with the intent of chilling that First Amendment right."  Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (citing Turner v. Safley, 482 U.S. 78, 85-89, 107 S.Ct. 2254,

2260-61, 96 L.Ed.2d 64 (1987), and Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989)).

There are two different types of retaliation claims that arise in the prison setting.  In one type of claim, a prisoner may established a First Amendment violation by demonstrating that a prison official took an adverse action against the prisoner because he or she filed a grievance. Farrow, 320 F.3d at 1248 (stating that "[t]he First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech.") (quoted in O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011)); Hollins v. Samuals, 540 F. App'x 937, 938 (11th Cir. 2013) (finding that inmate suffered an "adverse action" when his prison employment wages were reduced and then terminated)).

In the second type of claim, a prisoner can establish a First Amendment claim if he can show that a prison official issued a threat "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."  Pittman v. Tucker, 213 F. App'x 867, 871 (11th Cir. 2007).  In Bennett v. Hendrix, 423 F.3d 1247, 1251 (11th Cir. 2005), the Eleventh Circuit adopted the "ordinary firmness" test for analyzing this type of First Amendment claim.  The "ordinary firmness" test requires a plaintiff

to establish three facts:  (1) that his speech or act was constitutionally protected; (2) that the defendant's retaliatory conduct adversely affected the protected speech; and (3) that there is a causal connection between the retaliatory actions and the adverse effect on speech.  Bennett, 423 F.3d at 1250.  Thus, "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of his First Amendment rights."  423 F.3d at 1254.  "[A] plaintiff need not show that his own exercise of First Amendment rights have been chilled, but instead a plaintiff can establish an injury if he can show that the retaliatory acts are sufficiently adverse that a jury could find that the acts would chill a person of ordinary firmness from exercising his First Amendment rights."  Pittman, 213 F. App'x at 870 (citing Bennett, 423 F.3d at 1254-55).  "First Amendment retaliation is actionable because 'it threatens to inhibit exercise of the protected right.'"  Bethel v. Town of Loxley, 221 F. App'x 812, 813 (11th Cir. 2006) (citing Bennett, 423 F.3d at 1253); see also Taylor v. Crews, No. 4:14cv98-MW/CAS, 2015 WL 5042721, at *8 (N.D. Fla. July 27, 2015), report and recommendation adopted, No. 4:14cv98-MW/CAS, 2015 WL 5042805 (N.D. Fla. Aug. 26, 2015).

There is no question that a prisoner has a constitutionally protected right to present grievances to prison authorities.  The question is whether Captain McCamman engaged in retaliatory conduct (threats) which adversely affected Mr. Scott's protected speech.  Captain McCamman denies threatening Mr. Scott, but Mr. Scott provided evidence to the contrary.  There is a dispute of fact on this point.

There is also a dispute of fact as to whether the threat was sufficiently adverse that Mr. Scott feared to report his injuries and the threat.  Captain McCamman asserts that Mr. Scott was not afraid because he reported the threat to Captain Fronek.  Captain McCamman argues that "[i]t is also implausible that Mr. Scott had the courage to report the threats and injuries to Captain Fronek, a correctional officer and co-worker of McCamman, but was afraid to report the injuries to medical personnel who are employed by Corizon (not FDC), and who are there for the sole purpose of treating inmates."  ECF No. 63 at 21.

While acknowledging that he did make that verbal report so he could get pain medication, Mr. Scott contends that he was afraid to disclose the events to Nurse Dennis because he feared retaliation.  Mr. Scott testified in his deposition that when he saw that a camera had been brought in, he

"refused everything" and just requested ibuprofen.  He did not report injuries until he was transferred.

The test is not whether Captain McCamman's comments chilled Mr. Scott's exercise of his First Amendment rights but, rather, whether the incident was "sufficiently adverse that a jury could find that the acts would chill a person of ordinary firmness" from doing so.  In this case, there is a genuine dispute of material fact on this point.  A jury could find that Captain McCamman's threats, combined with the denial of medical care (if Mr. Scott's version of facts is believed) would chill a person of ordinary firmness from exercising his First Amendment rights by submitting grievances or otherwise complaining of his treatment.  There is a genuine dispute of material fact on this issue and Defendant McCamman's motion for summary judgment should be denied on this claim.  In light of the dispute of material fact, Mr. Scott's motion for summary judgment should be denied as well.

## E.    Qualified Immunity

Defendants generally raise qualified immunity as a defense in this case, ECF No. 63 at 22-23, although it is not specifically asserted in response to the retaliation claim. "Qualified immunity shields government

officials from civil liability when: (1) the government official was acting within the scope of his discretionary authority; and (2) the official's conduct does not "violate clearly established statutory or constitutional rights." Helm v. Liem, 523 F. App'x 643, 645 (11th Cir. 2013) (quoting Goebert v. Lee Cnty., 510 F.3d 1312, 1329 (11th Cir. 2007) (quotation omitted)). It has been clearly established that a prison official cannot retaliate against an inmate and seek to prevent the filing of grievances or submitting complaints about the conditions of confinement.  Defendant McCamman is not entitled to qualified immunity on the surviving First Amendment claim.

**RECOMMENDATION**

It is respectfully **RECOMMENDED** that: Plaintiff's motion for partial summary judgment, ECF No. 60, be **DENIED as moot**; Plaintiff's amended motion for summary judgment, ECF No. 71, be **DENIED**; Defendants' motion for summary judgment, ECF No. 63, be **GRANTED in part and DENIED in part**.  Both Defendants' motion and Plaintiff's motion should be denied as to the First Amendment retaliation claim against Defendant McCamman, and Defendants' motion otherwise granted.  It is further **RECOMMENDED** that this case be **REMANDED** to the undersigned Magistrate Judge for further proceedings prior to setting this case for trial.

**IN CHAMBERS** at Tallahassee, Florida, on August 3, 2016.


   s/   Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Specific, written objections to these proposed findings and recommendations must be filed within 14 days after being served with a copy thereof. Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. A copy of the objections shall be served upon all other parties. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636. A party may respond to another party's objections within 14 days after being served with a copy thereof.